UNION SULPHUR CO. v. FREEPORT TEXAS CO.*

FREEPORT TEXAS CO. v. UNION SULPHUR CO.

(Circuit Court of Appeals, Third Circuit.  March 4, 1919.)

Nos. 2391, 2392.

PATENTS ☞328—VALIDITY.

The Frasch patent, No. 799,642, claims 2, 3, 6, 12, 19, 21, and 22 for a process for sulphur mining, the Frasch patent, No. 800,127, claims 2, 3, 7, 11, 21, and 24, for apparatus for sulphur mining, and patent No. 1,008,319, claims 7, 26, and 28 for sulphur mining, *held* invalid, in view of the disclosures of the earlier Frasch patents.

Appeal from the District Court of the United States for the District of Delaware; Edward G. Bradford, Judge.

Suit by the Union Sulphur Company against the Freeport Texas Company for infringement of patents. There was a decree (251 Fed. 634) in favor of plaintiff as to a part of its claims, and in favor of defendant as to the remainder, and both parties appeal. Reversed on defendant's appeal, affirmed on plaintiff's appeal, and bill dismissed.

Elihu Root, Livingston Gifford, Samuel R. Betts, and James R. Sheffield, all of New York City, Joseph C. Fraley, of Philadelphia, Pa., and John W. Peters, of New York City (Sheffield & Betts, of New York City, of counsel), for Freeport Texas Co.

Frederick P. Fish and Charles Neave, both of Boston, Mass., Henry A. Wise, of New York City, and Maxwell Barus, of Boston, Mass., for Union Sulphur Co.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMPSON, District Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

255 F.—61    *Certiorari denied 249 U. S. —, 39 Sup. Ct. 392, 63 L. Ed. —.

BUFFINGTON, Circuit Judge. As this case involves basic matters affecting the whole sulphur product of the United States, a preliminary review of general sulphur production is, in our judgment, requisite to a proper consideration of this case.

In its natural state, sulphur is found in rock formation. This rock is mined, and when subjected to sufficient heat the sulphur liquefies. This liquid thereafter solidifies into the sulphur of commerce. The mining of sulphur rock was an old and developed industry and prior to the American method, here involved, was carried on in the ordinary methods of mining, viz. stripping where the sulphur was near the surfact, or shafting where the sulphur rock was too deep for stripping. Nine-tenths of the world's supply was produced in Sicily, which furnished 400,000 tons; Japan furnished 15,000, and the United States a few hundred. In Sicily the sulphur ore was mined from deposits which varied in depth from the surface of the ground to 340 feet down. Where the ore was near the surface, pits and quarries were used; where deeper, shafts and galleries. The mining machinery was crude, and the ore was carried by men and boys on their backs up steep slopes on circular stairways. How water, the ever-present enemy of the miner, was kept from flooding the mines where their primitive methods were employed, does not appear in the proofs, but that it actually was present, and was later overcome by pumps, appears in Plaintiff's Exhibit 88, The Mineral Industry, 1894:

"It is a striking fact that in the new development in Japan, on a remote island and against great natural difficulties, the most modern methods and management prevail, while in Sicily, in the center of the oldest civilization, these are to a great extent of the crudest. In 1889 the Sicilian industry experienced very hard times. Prices were low, and much hardship was caused. To some degree it led to improved methods, and in the larger mines pumps and hoisting engines are now installed."

And that water was present in the Sicilian mines is also shown by the report of Brühl, United States consul at Catania, quoted in Plaintiff's Exhibit No. 78, Seventeenth U. S. Geological Survey, 1895–96:

"The overproduction cannot well be reduced, for obvious reasons. Mines cannot, without serious loss, be left standing unworked, because in most of them the rapidly entering water has constantly to be pumped out; *otherwise it would soon fill and ruin the mines, especially those* which are worked in a primitive mode (where the sulphur is carried to the surface in bags by men and boys over stairs crudely hewn into the walls of the passages leading out of the mines), or would cause such damage as would require perhaps six months or more (depending, of course, upon the condition of the mine) to reopen and again put in a workable condition; it would ruin the larger mines which contain mostly machinery. * .* * "

In this state of the art, Sicily continued to supply the substantial part of the world's sulphur and practically the greater part of that consumed by the United States, for while sulphur was found in various parts of our country, and indeed a tremendous bed of it had, years before, been located in Louisiana, its depth and the nature of the overlying strata had thwarted all efforts to mine it.

This Louisiana deposit was discovered in 1869, when a well was being drilled for oil. It was substantially 100 feet thick and was lo-

cated between 400 and 500 feet below the surface. Although this enormous and valuable deposit was known to exist, and although large sums of money and high engineering skill were used, all efforts to mine it proved unsuccessful for 25 years. The existence of the sulphur bed and the failure to mine it finally attracted the attention of a man who, in inventive fertility and past experience seemed to be the one man to solve the difficulty and successfully work out one of the most remarkable wonders of world commerce. As what this man—Frasch—did, or, as it is now claimed, failed to do, is the real question which underlies this case, we deem a proper appreciation of what he had previously done, and the fields of operation he was familiar with, will throw light on the question of what he did, or failed to do, when he first attacked the problem of mining this Louisiana sulphur bed.

Turning first to what had been done there when Frasch entered the field, we may say that the sulphur bed had been discovered in 1869, when a company in drilling for oil struck this sulphur bed or pot, some hundreds of feet below the surface. It was a pure, high-grade sulphur, and the possibility of mining it by shafting methods at once, and for 25 years, appears to have attracted the men and companies that sought to do so up to the time Frasch entered the field. As we have said, the bed was drilled through when it was first discovered, and in the subsequent operations, preceding Frasch, different other wells were drilled, and by these drillings, not only were the different strata, above and below the sulphur bed ascertained, but cores were preserved of the sulphur, which, of course, disclosed its physical and chemical structures. These drillings also disclosed and located those two great obstacles with which the shaft miner has to contend, quicksand and water. The drill further showed that, after passing through the quicksand, there was a vein of cap rock which overlaid the sulphur, and it was felt that this cap rock would afford a base or support on which a caisson shaft, carried through the quicksand, could rest, and that the sulphur, protected by the cap rock, could be safely mined when the shaft was carried through such cap rock and into the mine. The drill also disclosed water strongly impregnated with sulphur, showing the water must have come in contact with sulphur, and, as the shafting progressed, the fatal accidents from sulphurous gas, which indeed largely contributed to the abandonment of shafting operations, showed, and indeed created, a record of, the intimate proximity of sulphur and water to each other. The principal difficulty in shafting arose from the quicksand, which, when the rings which formed the shaft reached a certain depth, forced its way up from the bottom of the inside of the rings, and precluded further effort. In addition to this, the sulphurous gas, which entered the rings, killed several men.

Into this field of failure Frasch entered, but from a new and wholly different angle. In effect he said:

"Abandon your shafting entirely, for by it you have never even reached the sulphur bed. Now in the drilling field, with which I am familiar, we have drilled, not shafted for oil, and we have pumped up oil and oil impregnated with sulphur. In that work we have steamed wells hundred of feet underground."

We can readily see how Frasch's work in drilling for oil, his knowledge of sulphur in steaming oil wells, all had prepared him for announcing the really astounding proposition of drilling a small-sized hole into the sulphur bed, carrying down hot water to melt the sulphur, and then pumping the liquid sulphur to the surface. This plan was looked on as visionary, and when suggested to men and companies in Italy and England, who were accustomed to shafting and stripping mining, it was considered so impossible and improbable as to give them no concern.

In his previous experience, Frasch had made some epoch-making inventions in which sulphur was the main factor. The petroleum produced from the great oil fields of Pennsylvania was wholly free from sulphur, and for that reason perfectly sweet burning oil, gasoline, paraffin, and oil's numerous by-products could be distilled therefrom. But both the Ohio and Canadian oil contained sulphur in such offensive combinations that it was impossible to refine them or get any by-products that were not so offensive as to make them unmarketable. Indeed, no use could be made of this vast oil product, save for fuel, for the odor emanating from its sulphur was so offensive and permeating that cargoes of ships carrying flour and bacon near vessels loaded with these oils were spoiled. Without entering into details, it suffices to say that, when he turned his attention to this sulphur pest, Frasch eliminated it by his process of refining and revolutionized the Ohio and Canadian oil industry, making it equal to the Pennsylvania product. Indeed, while Frasch was exploring this Louisiana sulphur field, he was also turning his attention to treating oil while it was in situ underground, with a view to increasing production. This came about in this way: Pennsylvania oil was found in Devonian sandstone and to increase its underground flow this sandstone was shattered by exploding nitroglycerine at the bottom of the well. On the other hand, the Ohio, Indiana, and Illinois oils are located in Silurian limestone. As these wells were exhausted, it was found nitroglycerine did not have the rejuvenating effect in limestone it had in the Pennsylvania sandstone, so Frasch devised the successful use of sulphuric or hydrochloric acid for increasing the oil flow, for by plugging the well after the acid was poured down the pressure of the carbonic acid gas forced the acid through the most minute cracks of the limestone and thus opened new sources of oil supply.

But not only did he do these particular things, involving sulphur and treating fluids or soluble minerals in situ, but Frasch, from his connection with the oil well industry, was trained in what was probably the most resourceful and most original art in any branch of human activity in overcoming obstacles. The great oil fields of Pennsylvania have given the courts of the Third Circuit a more than ordinary acquaintance with the art of gas and oil well drillings, and in no other field of activity have we found such fertility of resource and original skill. Why this is so will be apparent at once, when it is realized that the great elemental forces with which the operator contends are located from 1,000 to 3,000 feet below the surface, and can only be reached by mechanism of the size of a 6, 8, or 10 inch bore, and that such

mechanism must be controlled and operated from the surface. When to these subterranean difficulties we add the fact that these operations are carried on in places isolated from machine shops and customary appliances, we can appreciate that the well drillers' art is a species of mining distinct in itself, and those engaged in it are the most resourceful of men. The wonderful developments of this art, its control of water, its mastery of quicksands, its recovery of tools, pipes, and fittings from the bottom of wells—these and many other features unite to make the art one in which improvements in the art, which in other arts would be looked on as inventive, are in this art considered as the natural and to be looked for expedients and devises of self-reliant, resourceful men. We can thus see that the daring, original, and inventive step, which Frasch took in proposing to melt this sulphur bed in situ and then pump it to the surface, was made by a man who appreciated what he wanted to do, knew the obstacles he would have to encounter, but who was particularly qualified to overcome those difficulties. We can also understand that Frasch entered the field, knowing it was going to take time, for he was a man of such large affairs and general activities that even this sulphur development was a side issue, or as he himself said:

"At that time my sulphur enterprise was merely a hobby, the bulk of my time being devoted to my Standard Oil work."

He approached the problem in a most thorough way. From the proofs it would appear that some wells had been previously drilled through the sulphur bed, and that records had been kept of the strata, and cores had been taken of the sulphur itself as these wells were drilled. We here remark that the contention of the plaintiff is that Frasch conceived his process and applied for his process patent under a fundamental misapprehension of the physical character of the sulphur bed he was proposing to operate. We find no warrant in the proofs of this assumption, and Frasch himself proves the contrary. He got a core of the sulphur; he had it before him; he knew just what its physical structure was. It is said his patent was based on the assumption that the Louisiana sulphur was similar to Sicilian sulphur, in that it was impervious to water, while in point of fact it was porous. In the first place, if the Sicilian sulphur was impervious to water, there is no proof whatever that Frasch had then visited the Italian mines, or knew that their sulphur was waterproof. And we have seen, also, that in some way water did get into the Sicilian sulphur mines. But there is proof that he knew the physical structure of the Louisiana sulphur, for the very first thing he did was to get "a core from the sulphur deposit"; so that it is perfectly clear that Frasch started out with a knowledge from this core, of just what the structural character of this sulphur was. If it was porous, he had the evidence of its porosity before him. If he knew the nonporous character of the Sicilian rock, and if this Louisiana core differed from the Sicilian product, then he had them before him for contrast. If his patent was based on the theory of nonporosity, we would naturally expect some reference to be made in specification to the matter of porosity

or nonporosity; but not only is there none, but when, 22 years after, Frasch summed up all his work and detailed all the obstacles that confronted him in this Louisiana field, and when he recounted how he had been misled in regard to the sulphur bed, he never once referred to sulphur porosity or nonporosity, or suggested that his process was based on the assumption of nonporosity. On the contrary, he then and there asserted that his original process was carried out successfully, and, what is more, he made no reference to, or attributed any inventive character to, any act, device, or disclosure made subsequent to his original discovery and disclosure.

Turning to the account of Frasch just referred to, it will be seen that, in addition to getting the sulphur core, he also got the drilling records; but these, as he subsequently found, had been colored by people who expected to float companies, and that what he had considered correct later proved to be entirely wrong. In that regard he says:

"Unfortunately, all the drilling records had been colored by the people who expected to float companies. Everything unfavorable was concealed, and only that given which would be likely to induce investment, so that what I had considered a correct report proved later to be entirely wrong."

What this coloring was he does not say, and certainly does not say it was in regard to the porosity of the sulphur or the fact of water permeating it. That the company had been misled as to the presence of water he does say, and that this misleading information had, when rectified, led to the company abandoning the work; but, as this abandonment took place before Frasch began his operations for the company, it is clear that he himself was under no misapprehensions as to the presence of water when he began work. As to this discovery of water, the presence of water containing hydrosulphide, the death of the men, the water permeating the sulphur, and the consequent abandonment of operations by the company, Frasch says:

"They had a very ingenious scheme for sinking a shaft with a shield, but after the expenditure of a great deal of money the shield was lost, and the danger due to the presence of water containing hydrogen sulphide was demonstrated by the death of a number of men. It was decided to abandon this method, especially after a drilling record had been made by a drilling company who reported direct to the owners, when it was discovered that there was no roof over the sulphur, *and that sulphur water was permeating the deposit in inexhaustible quantities.*"

What was the misleading information, which Frasch had, he does not say; but its nature was such as led him to believe the sulphur bed extended through the region generally, and to purchase adjoining property and drill a well of his own, which first well was followed by three others. Referring to these matters Frasch says:

"*Being misinformed as to the character of the deposit,* I reached the conclusion that the sulphur was distributed in the rock, as in Sicily, and, when I heard of the limestone roof covering the deposit, I felt that sulphur could be found anywhere within reasonable proximity to the sulphur mines. * * *

"In view of the information obtained from the various companies, I believed that there was sulphur over miles of territory, and started to drill on land I had purchased within a mile and a half of Sulphur Mine. I went down over 2,000 feet without finding anything. Then I located a second, a third, and a fourth well, but found no sulphur in any instance. This took much time

and money, and I finally reached the conclusion that all the sulphur was located on the land owned by the New York company operating it at the time."

From Frasch's account it appears that from the very start he determined not to operate the bed as was done in Sicily, not for any physical reason, but on the practical commercial one that he could not compete with Sicilian labor. In that regard he says:

"I realized at the outset that a method entirely different from that employed in the mines of Sicily was necessary for success here, as the class of labor required to operate this mine would demand at least $5 per day, while the Sicilian miners were being paid 60 cents."

This labor barrier Frasch determined to overcome by abandoning shafting, quarrying, and carrying to the surface. His plan was, as stated by himself:

"To meet the extraordinary conditions existing in this deposit, I decided that the only way to mine this sulphur was to melt it in the ground and pump it to the surface in the form of a liquid. After careful study and consideration, I became convinced that this could be done."

Having found no sulphur in the four neighboring wells he drilled, Frasch evidently came to the conclusion that the sulphur bed was confined to the company's property; so he became associated with them, and proceeded to drill a test well, which led him to completely modify the process and apparatus he had expected to use. In that regard he says:

"I succeeded in getting possession of the property, and at once set to work to drill a well of sufficient diameter to determine finally the character of the existing material. When this had been done, I was obliged to modify completely the process and apparatus I had expected to employ.

"At that time the drilling of a well in an alluvial deposit containing quicksand, etc., was a very tedious task, and it took from six to nine months to get through the alluvial material to the rock—work which we do to-day in three days."

At this point we note that the well which Frasch then proceeded to drill on the company's property was presumably drilled to carry out the process and to use the apparatus disclosed in the patents which he had then obtained. Such being the case, three questions naturally arise: First, did the well prove the process was practical? Second, did the apparatus suggested in the patent, and used in the well, show a practical way of using the process? And, thirdly, what modifications of the process and apparatus did this well lead Frasch to make?

Let us first see what Frasch had patented. As to process, there were two: The first was one in which hot water was used to liquefy sulphur; the second was one in which the sulphur was liquefied by chemicals. The water process was applied for October 23, 1890, and resulted in the grant of patent No. 461,429, of October 20, 1891. The gist of the invention is thus stated in the specification:

First, the use of underground fusing: "The fusion or melting of the sulphur in the mine or underground deposit and its removal in a fused or melted condition."

Second, the fusing agent: "To fuse the sulphur, use is or may be made of a heat-conveying fluid or vehicle, preferably a cheap liquid, such as water."

Third, the means for bringing the sulphur to the surface: "The liquefied sulphur need not be forced up by the heat-conveying liquid, but may be pumped up in any ordinary or suitable way. * * * The term 'pumping' is intended to cover the movement by means of a pump or any known or suitable substitute for a pump."

And in connection with this third or latter feature we here note that as but one claim specifies "pumping," and all the others use the general term "removing," it is quite evident that Frasch contemplated that any known kind of lifting agency fell within the scope of his process. As to the use of water as a heat-conveying vehicle, it is quite evident, in his application as originally filed, Frasch made "contact" of the water with the sulphur an element of his claims. Such water-sulphur "contact" is specified, for instance, as (claims 3–9, inclusive) "fusing the sulphur in the mine by bringing *into contact* therewith a fluid," etc. But on December 26th following Frasch filed additional claims, and among them was claim 10, which provided:

"The process of mining sulphur, consisting in *circulating through the underground* deposit of sulphur or sulphur-bearing rock a fluid, such as water, at a temperature above the melting point of the sulphur, thereby liquefying the sulphur by fusion, and removing the melted sulphur, substantially as described."

In this it will be observed he changes from "contact" to "circulating through the underground deposit or sulphur-bearing rock a fluid." It is quite evident, therefore, that Frasch, by this addition of a "circulating through claim," meant something different from his "contact" claims, and that two subdivisions of water treatment are disclosed by this patent, viz.: One, the fusing of sulphur by water coming in contact therewith; the other, by water circulated through it.

When Frasch, on October 23, 1890, applied for this patent, he coupled with his process a form of apparatus by which his process could be used. The office compelled a division, and his apparatus was finally patented to him in No. 461,430, granted October 20, 1891. Without entering into details, it suffices to say this patent disclosed three distinct elements, but all used in combination, viz.: First, the fluid heating appliances on the surface; second, the appliances which carried the heated fluid to the sulphur bed; and, third, the appliances by which the sulphur melted underground was brought to the surface. Referring to his drawings, Frasch says:

"Figure I is a diagram of a plant for mining sulphur in accordance with the invention. Figure II is an enlarged diagram of the well."

Taking these two figures as embodying his plant and his well, Frasch adds:

"Referring to Figs. I and II, a well A is drilled as usual, in making salt and oil wells," etc.

He then proceeds from this point (line 52 of page 1 of his specification to line 80 of the second page of his patent) to describe the process and the apparatus for securing sulphur fusion. The reference letters in his description are to plant, Figure I, and well, Figure II, and there is no reference or allusion in this description to any other draw-

ing or feature of the specification, save these shown in Figures I and II. Therefore the language he uses applies to and must be read onto Figures I and II. In the operation thus described, the hot water from the heaters is forced by force pump F, down the casing B, and after it has melted the sulphur, such water, together with the melted sulphur, is forced to the surface through the tubing C, and eventually returned to the heater. It is of this circulating process and device the specification says:

"It will thus be seen that there is a closed circuit, which includes a chamber in the sulphur or sulphur-bearing rock, and through which water at a temperature sufficient to fuse the sulphur is forced."

But this water pressure, water circulating and water-sulphur lifting process is not the only one Frasch suggested. In his specification he also says: "Fig. III is a view illustrating a modified arrangement of part of the apparatus"—which was noncirculating. This modification Frasch thus describes:

"Instead of relying upon the pump F to force the melted sulphur and hot water up the tubing C, *a pump F' at the bottom of the well in the tubing C may be employed, as shown in Fig. III.* By the use of this latter pumping arrangement it is *not necessary to fill the cavity* in the mine with hot water in order to remove the melted sulphur, since it can be raised *by the pump* in the tubing C. The mine might be filled with hot water, and after a quantity of sulphur had melted this could then be removed by the pump F', thus making the operation of melting the sulphur and removing it periodical. The pump F' is formed by a working barrel at the bottom of the well and a plunger operated by a sucker rod with valves such as are commonly used in oil wells where a similar arrangement of pump is employed."

Frasch also pointed out another modification, saying: "Fig. IV is a view illustrating a further modification"—which it will be observed may be either circulating or noncirculating. This modification he thus describes:

"In Fig. IV there is a third passage or pipe T extending into the mine, through which the hot water (or other fusing vehicle) pumped down the casing B may be allowed to escape after having first melted the sulphur in the mine. The melted sulphur collects about the end of the tubing C, through which it is raised by the pump F'. Of course it could be forced up by the pressure in the mine by checking the outflow from the pipe T. The pipe T is (or may be) connected with the heaters H."

The specification does not state the distance pipe T is from the main pipe or when it was drilled. It follows, therefore, that it is quite possible that the pipe T may have been drilled at such distance in time and place from the main well that the hot water coming down the main well would have to work its way for a considerable distance through the sulphur rock itself, or fissures in it, in order to reach the outlet pipe T. And it is also apparent that, the hole for T being drilled through the same strata as the main well, but having no casing to shut off the water in the strata which the drill passed through, the water of the strata would, as the well was drilled, flood the hole, and consequently the sulphur bed.

It will, of course, be noted that, whatever the problematic effect of the drilling of the bleed pipe T, it is apparent that, as stated in the ex-

tract quoted above, the device was one which provided two water courses: A closed circuit similar to that of Figs. I and II; for, as stated in the extract last quoted:

"Of course it could be forced up by the pressure in the mine by checking the outflow from the pipe T. The pipe T is (or may be) connected with the heaters E."

Instead of being thus used as part of a closed circuit, or a dead end to secure a closed circuit, pipe T might be used as an open outlet to the surface, viz. "the hot water (or other fusing vehicle) pumped down the casing B may be allowed to escape after having first melted the sulphur in the mine," in which case, as the specification states, "The melted sulphur collects about the end of the tubing C, through which it is raised by the pump F'." From this it will appear that this apparatus patent really disclosed alternative uses of apparatus: First, the closed water circuit of Figs. I and II, with water lift of sulphur; second, the closed water circuit of Fig. IV, with water lift of sulphur; third, the water circuit of Figs. I and II caused by deadheading pipe T of Figure IV, with water lift of sulphur; fourth, the open outlet through T of Figure IV, with pump lift of sulphur; and, fifth, the partial water filling of the sulphur when Figs. I and II were used without closing the circuit and a pump or other device was used to lift the sulphur.

In addition to these several modifications indicated in these two patents, where water was the heat vehicle used, it will also be apparent that all these agencies, appliances, and processes could be used by Frasch in his later patent No. 461,431, which he applied for on December 26, 1890, where his fluid, in addition to conveying heat, was a solvent such as "bisulphide of carbon, tar, petroleum, and other hydrocarbon or ethereal oils."

From this résumé of Frasch's patents, it will be seen, he had several modifications or alternative methods he could employ, and his work was not based on a single, predetermined plan, adapted to meet but one set of underground conditions.

Turning from these theoretical, paper outlines of his process, let us ascertain what Frasch actually did, and how his theories worked out when he drilled his fifth well, which was located on the ground under which the four prior wells told him the sulphur could only be found. Of this well, and the success of his process, we have quite full proof.

Frasch's first well on the Sulphur Company premises was No. 14. It was drilled in the fall of 1894, under the directions of Jacob C. Hoffman, an experienced man, and one who evidently knew conditions and obstacles he would naturally have to overcome. Hoffman says there had been 13 wells drilled before that by the company, that the cores were there which had been taken out in former drillings, that there were blueprints showing the different formations, and that he found the reports of both Schmitz (1893) and Rothwell (1890) in the Office. The heating plant was built, the well drilled and provided with apparatus as outlined in Frasch's patent, and the difficulties and delays

were those incident to a work of this character. In that respect Frasch says:

"At that time the drilling of a well in an alluvial deposit containing quicksand, etc., was a very tedious task, and it took from six to nine months to get through the alluvial material to the rock—work which we do to-day in three days."

The first part of the work determined on was to drive a 10-inch casing through the quicksand until they reached the cap rock. In that regard the patent said:

"A well A is drilled, as usual, in making salt and oil wells, a casing B (say 10 inches in diameter) being brought to the rock above the sulphur, so as to shut off water and quicksand."

This is what Hoffman says they did:

"We were attempting to drive a 10-inch drive pipe from the surface down to the rock overlaying the sulphur deposit."

As to the difficulties he says:

"In driving the pipe we encountered an enormous deposit of quicksand, which seemed to grip the pipe very firmly, so it was very hard work to drive this pipe downward. * * * I recall that in some cases we would allow a stem weighing nearly 2,000 pounds to strike the driving cap on top of the drive pipe as much as 200 times to drive the pipe an inch."

But these difficulties, and the quicksand pushing up through the drive pipe with such tremendous pressure as to float the tools, were overcome, and as Hoffman says:

"This method of drilling continued practically until we had driven the 10-inch pipe onto the rock overlying the sulphur."

The cap rock being reached, and the patent instructing, "and a smaller hole (say 8 inches in diameter) being continued into or to the bottom of the sulphur deposit," Hoffman followed these instructions, his testimony being:

"After driving the 10-inch pipe firmly onto the rock, we reduced the size of the bit with which we had been drilling from 10-inch to 8-inch, and we continued the 8-inch hole to the bottom of the sulphur bed."

After driving 4 or 5 feet into the sulphur, Hoffman struck a flow of sulphur water. This gave them considerable trouble; its volume and head was such that it rose 8 feet above the derrick floor. Although the gas from this waterflow caused serious physical annoyance to the drillers and necessitated substantial changes in drilling arrangements on the derrick floor, it is highly significant that neither Hoffman nor Frasch allude to this water flow as anything unexpected.

The proof also shows that all the wells drilled by the old company were flowing water. The Schmitz report of 1893, to which Hoffman refers in his testimony, shows that in the well drilled in February, 1893, from the time the drill entered the sulphur bed at 472 feet, there was an almost steady increase in water, until at 560 feet a test showed 160 gallons per minute, "of which 140 gallons are issued from the 4-inch casing and come from the upper sulphur horizon from 472 to 520 feet.

No increase of water has been found from 520 to 560 feet, but the water has greater force at 560-foot level or depth and rises 8 feet above drill floor, or over 9 feet above surface in a 3-inch pipe."

Referring to the increase of water which was found from 660 to 680 feet which was through sulphur or sulphur and limestone, Schmitz says:

"That the increase was direct due to water sources struck in the last 20 feet. * * * The limestone and gypsum (especially the former) has many cavities, as the drill record shows, which cavities have likely large extension in the strata, or connect with each other horizontally and vertically, and thus may communicate the waters from the principal flows of the sulphur-bearing marl, limestone, and gypsum strata, and from one level to the other."

In the Supplement of June 3, 1893, Schmitz says:

"While I have only small hopes that the property of your company can be ever mined with success by the common methods (shafts, etc.) on account of the porous and cavy structure of the formation and the *water masses present in the sulphur deposits* and formation, I think it but proper that the directors of your company should do no decisive step as to the abandonment of the property until they have fully satisfied themselves that the *waters of the Sulphur horizon below the big flows are too large to be controlled,* and as well that there exists no other practical methods of extracting the sulphur than by the common shaft methods."

As these reports were accessible to Hoffman, as Frasch had joined forces with the company, as the company had been advised that this water in the sulphur forbade shaft mining, and as neither Hoffman nor Frasch say the presence of water in the sulphur was any surprise to them, we are justified in declining to believe that Frasch's patented process, or his use of it in well No. 14, was based on the assumption that the sulphur in this property was nonporous and free from water.

When the drilling of the 8-inch hole, extending from the cap rock and the end of the casing and into the sulphur bed, was completed, a 6-inch tubing was inserted, with a plug at its lower end. This tubing was perforated at the lower end to strain the entering sulphur, while higher up were larger holes for the outflow of the hot water. Within the 6-inch tubing was a string of 3-inch pipe provided with a working barrel and sucker rods, adapted for pumping melted sulphur. As to the appliances on top of the ground for heating the water and forcing it, under pressure, into the sulphur bed, no detailed description need be given, further than to say they were in substantial form, as directed in the specifications. The well having been drilled, the process used was thus stated by Hoffman:

"After having the well connected up, as I have above described, we first tested out our steam lines and connections to the heater and connections leading to the well. When we found everything was tight, we shut off the steam and blew out the heater through the exhaust valve I have already referred to. We next started our pumps, pumping cold water into the heater and allowing this to flow by gravity from the bottom of the heater down the 6-inch casing and out into the well. This was to see if the strainer had not become obstructed in lowering it into the well. When we found that the water passed down freely without backing up into the heaters, we gradually turned the steam on from the 3-inch line leading from the manifold above the boilers to the heaters. This operation was always part of my duty, because it became necessary to allow the steam to pass through the valve very slowly,

to prevent any pounding of the lines as it met the hot water. After having the full boiler pressure on the well for about 24 hours, during which time, of course, we were pumping water into the heater all the time, Mr. Frasch personally raised the lever leading from the safety valve in the line extending horizontally from the T, allowing the accumulated steam in the 3-inch tubing to escape. This steam blew very strongly at first, and after continuing for a short time it seemed to lack the force it started with, and in watching Mr. Frasch's face I felt that he realized the well had sealed over, and in a short time no steam would escape through this line. This proved to be the case; the well had sufficiently sealed after going through this exhaust pipe for about 5 minutes that we could remove the valve on the top of the 3-inch tubing and get ready to lower the sucker rods and plunger, in order that we could start pumping the liquid sulphur. We then connected the plunger on the bottom of the sucker rods, lowered these rods and plunger down to the working valve already referred to, put a stuffing box on top of the 3-inch through which the polished rod operated, connected the sucker rod with the walking beam, starting the engine, and in a short time were pumping sulphur."

From this it will be seen that on the first trial Frasch's process proved practical; sulphur was liquefied underground and pumped to the surface. Frasch's interesting account agrees with Hoffman's, and is:

"I drilled a well through the alluvial deposit to the rock with a 10-inch pipe; then continued through the sulphur deposit, which was about 200 feet thick, with a 9-inch drill, and immersed a 6-inch pipe from the surface to the bottom of this well. The 6-inch pipe had a strainer only 6 inches long, at the very bottom, and a seat to receive the 3-inch pipe through which we expected to lift the sulphur to the surface. The 6-inch pipe, directly above the seat for the 3-inch pipe, was also perforated for a distance of 3 feet.

"After the well had been drilled, and before the pipes were inserted, it was filled up with sand in order to insure a tight receptacle at the bottom for the liquid sulphur. After the same had been washed out, the pipes were inserted and equipped, and the well was ready for the melting fluid.

"This melting fluid consisted of water superheated to 335° Fahr. *The porosity of the rock in which the melting had to be done* seemed to furnish an almost insurmountable obstacle to success, as I feared that the *wild waters* in the rock would break into the melting zone *I expected to create*, and reduce the temperature of the fluid with which I expected to melt below the temperature necessary to fuse the sulphur. I had supplied a large number of boilers to furnish the heat necessary to maintain in the well a temperature higher than that required for the fusion of the sulphur.

"The water was superheated in columns in which 100 pounds per square inch pressure was maintained, and the apparatus which I had constructed to accomplish this proved efficient. We used 20 150 horse power boilers for a well, which represents experimentation on a ponderous scale.

"When everything was ready to make the *first trial, which would demonstrate either success or failure*, we raised steam in the boilers, and sent the superheated water into the ground without a hitch. If for one instant the high temperature required should drop below the melting point of sulphur, it would mean failure, consequently intense interest centered in this first attempt.

"After permitting the melting fluid to go into the ground for 24 hours, I decided that sufficient material must have been melted to produce some sulphur. The pumping engine was started on the sulphur line, and the increasing strain against the engine showed that work was being done. More and more slowly went the engine, more steam was supplied, until the man at the throttle sang out at the top of his voice, 'She's pumping.' A liquid appeared in the polished rod, and when I wiped it off with my finger I found my finger covered with sulphur. Within five minutes the receptacles under pressure were opened, and a beautiful stream of the golden fluid shot into the barrels we had ready to receive the produce. After pumping for about 15 minutes, the 40 barrels we had supplied were seen to be inadequate. Quickly we threw up

embankments and lined them with boards to receive the sulphur that was gushing forth, and *since that day no further attempt has been made to provide a vessel or a mold into which to put the sulphur.*

"When the sun went down we stopped the pump to hold the liquid sulphur below until we could prepare to receive more in the morning. The material on the ground had to be removed, and willing hands helped to make a clean slate for the next day. When everything had been finished, the sulphur all piled up in one heap, and the men had departed, I enjoyed all by myself *this demonstration of success.* I mounted the sulphur pile and seated myself on the very top. It pleased me to hear the slight noise caused by the contraction of the warm sulphur, which was like a greeting from below—proof that ·my object had been accomplished. Many days and many years intervened before financial success was assured, but the first step toward the ultimate goal had been achieved. *We had melted the mineral in the ground and brought it to the surface as a liquid. We had demonstrated that it could be done."*

The well was pumped for 4 or 5 hours, producing some 500 barrels of sulphur, when mechanical difficulties began. The pump sucker rods started to jerk, and finally ceased working altogether. The difficulty was at once diagnosed as due to the sulphur corroding the iron working parts of the valve and pump, and when the sucker rods were drawn such proved to be the case. It was at once seen these iron parts must be replaced by ones that would not corrode; aluminum was determined upon, and it was arranged that Frasch, who was then leaving for Cleveland, should send such aluminum parts to the well. Before leaving, and pending the arrival of the aluminum parts, Frasch arranged to operate the surface plant and steam the well, so that, as Hoffman testified:

"We would be storing up heat in the sulphur rock as well as melting sulphur, so that when he furnished us with the new working valve we could immediately lower this and start pumping right away."

But, unfortunately for this plan, the pressure on the boiler of the heating plant had developed dangerous weakness, and—

"fearing that this would let go and cause an explosion, we had to shut off our steam, and in shutting off the steam the sulphur cooled around the six-inch casing, closing the water outlets, so that when we attempted to again operate the well we could get no water to pass through the 6-inch casing."

The result was that after the first pumping, which was the latter part of 1894, no further pumping took place until the fall of 1895; but it will be noted that such delay was wholly due to defects in the surface plant, pump, and valve, and was in no way caused by any defect in the Frasch process. In this period of inaction the well piping, as also the surface apparatus, were practically replaced. As to the well equipment, tubing, and casing Hoffman testified:

"In starting to equip the first well, our first casing was the ordinary black oil well casing, of rather light weight, and a finer thread than we used later."

When the sulphur congealed and solidified in and around the tubing, working barrel, etc., it of course became necessary to pull the tubing, and, when this was done, both new tubing and casing were put in; obviously, a protracted job. As Hoffman says:

"The time spent between the congealing of the well after the first operation was all consumed in clearing the well of the pipe, so that it could be recased and retubed with new equipment."

In addition to this retubing and recasing of the well hole, there were four, and only four, changes, none of which were process changes. There was, first, a new and heavier heater top in connection with the sulphur heating system; second, using a tapering plug at the end of the tubing, to facilitate dropping the tubing to place, using a shorter strainer and galvanizing it; third, making a tighter joint at the point in the tubing where the water flowed out and the sulphur ran in; fourth, using aluminum pump valves, to avoid corrosion. Having made these changes, the second trial was made by the same process as the first, but with the result that this time the tonnage was increased to 500 tons. Then, as it proved, the aluminum valves proved too frail; the pumping ceased, the sulphur congealed, and another delay ensued, until the spring of 1896. Hoffman testified as to this breakdown, its cause, and its remedy, as follows:

"After having put in the aluminum valves, the sucker rods, and made the connection of these rods to the walking beam, we started pumping. * * * The second pumping we got about 500 tons of sulphur. The well up to this time had not what we call 'blowed'; by this I mean there was sufficient melted sulphur in the tubing to keep the steam and water out of this pipe, but finally we noticed that the sulphur stream had ceased flowing, although the engine continued to run freely. We then decided that our aluminum valves must have broken from the jar of the heavy column of sulphur above. In attempting to remove the barrel and the valves, we had to shut off the hot water to the well, and the melted sulphur again congealed around the 6-inch casing and tubing."

Following this there was another cessation, or, as Hoffman testified:

"The next sulphur we obtained was in the spring or early summer of 1896, and was from well No. 14, the original well drilled in while I was there."

In this interval changes were made, all of which were also not of process, but of apparatus to carry on the original process, as follows:

First, the water supply from the adjoining marshes was supplemented by a river supply pumped into a ditch or canal 8 miles long; second, four steam boilers, of 150 horse power each, and 10 heaters, were added; third, to obviate congealing of sulphur when the tubing had to be pulled, rapid-acting, tubing-pulling devices and additional valves and appliances were provided, so that sulphur congealing would be obviated; fourth, instead of the frail aluminum pumping device, an air lift was provided. This air lift consisted simply of an inch air line, suspended in the 3-inch line. This latter line had been used in the former trials. It was thus described by Hoffman:

"The top of the 3-inch tubing was fitted with a T and our usual horizontal pipe was run out towards the sulphur bins. This pipe was provided with a safety valve as in our first operation. In the top of the 3-inch T was a heavy plug. This plug was threaded on both top and bottom sides, and in the bottom of the plug was screwed the 1-inch air line which hung down into the 3-inch tubing and extended to within probably 13 to 15 feet from the bottom of the well. In the top of this plug just described was also a 1-inch line which was connected with an air compressor, which had been sent us since our last difficulty in pumping by means of the sucker rod method, and which we hoped to use in raising sulphur in our next operation. * * * We in all cases first tested our lines as previously described. Steam was then turned into the 6-inch casing. This was continued for probably 10 or 12 hours. We then turned one of the heaters into the 10-inch pipe and continued that for another 12 hours; of course, at all times keeping the heat going down the 6-inch casing.

On trying the well for melted sulphur after steaming probably 24 hours, we found the well sealed. We started our air compressor, and the pressure commenced to gradually rise, and in a short time the sulphur was flowing in gushes out of the sulphur discharge pipe into the bins. We continued pumping by this method as long as we could get any melted sulphur or had bin capacity for the same."

Hoffman testified the air compressor was known as the Clayton compressor; that it was a secondhand one; that while Mr. Frasch was at the well, and gave instructions to them how to use it, when sulphur was first pumped; that "we had tested out the air compressor after having placed it on its foundation."

A study of the proofs in this case also satisfies us that the long delays, before this sulphur process proved commercially profitable, were not due to unexpectedly meeting water in the sulphur deposit, or the necessity of further invention of apparatus to utilize Frasch's process, but were due to financial, fuel, drilling, and the like difficulties. Neither Hoffman nor Frasch assert that the presence of water in the sulphur strata was unexpected, or caused any change in their plans. When Hoffman began drilling under Frasch's directions, they had the drilling of the former wells; they knew these 13 wells were each and all flowing sulphur water. In that regard, Hoffman says:

"When I first went there, instead of 1 flowing well, there were at least—or to be exact, I think there were—13 flowing wells, and all of them flowed sulphur water freely. One of them we rigged up and used for bathing purposes. I do not recall the various sizes of the pipes leading from these wells, but each flowing well seemed to be flowing the full capacity of the outlet pipe from that well."

It is quite evident that Frasch recognized that the hot water he pumped into the wells probably passed off in these flowing wells, for as soon as Hoffman's first well, No. 14, was drilled, Frasch directed the 13 wells to be shut off. On that point Hoffman says:

"We had rigged up one well, as I before stated, for bathhouse purposes. After we had been steaming well No. 14 for some time, I noticed in bathing that the water we used in this bathhouse well was warmer than it had been. I took the temperature of the water, and found that it had increased. I advised Mr. Frasch, who was in Cleveland, of my observation, and he in turn advised me to shut off all the flowing wells, so as not to allow any of our hot water to possibly escape through that channel."

Indeed, we cannot read Hoffman's testimony, and escape the conviction that the water they encountered was nothing out of the ordinary, and they met it and neutralized its effects by increasing heat or damming off the incoming cold water. As to meeting the cold water by correspondingly increased heat at the surface, Hoffman's account is:

"Q. Well No. 14, as I understand your testimony, was first steamed and pumped late in December, 1894? A. Yes, sir.

"Q. At that first steaming and pumping, what was the temperature of the water at the heaters? A. 330°.

"Q. You understood at that time that a considerable portion of this heat would be lost by the water while passing down the 6-inch tubing in the well, didn't you? A. We understood some would be lost by coming in contact with the cold water.

"Q. And it would be lost before the water ever reached the sulphur deposit? A. Yes, sir.

"Q. And that is one reason that you applied such a high temperature at the boilers or heaters? A. The matter of the proper temperature of the water that we were to put into the well was given us by Mr. Frasch. He stated that we would want to maintain a temperature of about 330 degrees to get our best results. I believe that about 95 pounds' steam pressure at the boilers gave us a temperature of 330 degrees at the heaters, and we had the safety valves on our boilers set that they would blow off at about 100 pounds' steam pressure, so that we would not increase the temperature of the water above the figure set by Mr. Frasch. He said at that time, if we used the water at a higher temperature, it would have a tendency to thicken the liquid sulphur."

In drilling the next well, No. 15, a fissure of 7 feet was discovered, and the incoming water was dammed back with sawdust. With reference to it, Hoffman testifies:

"In well No. 15, as I recall it, we struck some fissures after reaching the sulphur deposit, one fissure of which was at least 7 feet deep. Before turning the hot water into well No. 15, we pumped a considerable quantity of sawdust mixed with the water down the 6-inch casing, and allowed this to flow out with the cold water, in the hopes of bridging across some of the openings, so that our heat would not flow away when we started to pump the hot water. We probably pumped sawdust for 2 days before turning steam into the well?"

Frasch's account of the use of sawdust was:

"About that time we found that some wells gave out and ceased to pump when there had been no breaking of the pipes. I reached the conclusion that the cold sulphur *water permeating the rock had broken into the melting zone*, and brought the temperature of the melting water below the melting point of sulphur. I thought this might be remedied by pumping large amounts of a material like sawdust into the mine with the melting fluid, and that, if the quantities of sawdust were large enough, *the channels through which the wild waters in the rock entered the melting zone could be sealed.*

"One well, after pumping about 7,000 tons, at the rate of approximately 350 tons per day, ceased to produce. The pipes were all in good order, and we started to pump sawdust into the ground with the melting water. After pumping in about 6 carloads per day for 5 days, the well 'sealed' with the sulphur and promptly produced 39,000 tons more before the caving of the rock broke the pipes."

We are not overlooking the difficulties and delays met with in developing this process up to the complete commercial success it proved itself to be in 1903, but we are satisfied that such delay and difficulties were not caused by defects in Frasch's original conception or in means to utilize it. As already pointed out, Frasch was immersed in other work; he regarded this as a side issue; his visits were infrequent; the work was frequently suspended, for as much as a year at a time; the finances were such that the work was badly hampered, as Hoffman testified at length; and the appliances generally were on such a stupendous scale that changes or improvements required time. In that regard Frasch says:

"These improvements were made slowly, as all experiments had to be made on a ponderous scale, and the smallest change required a great deal of time. During the long intervals which necessarily elapsed between my visits to the mine, *I could give this new enterprise no attention.* It took months to drill a new well, when an old one was lost. At one time the work lay idle for a whole year before I could take it up again, and it was not until 1903 that we could see financial success ahead."

We have thus described at length these earlier operations of Frasch, and the results attending them, with a view of testing the contention on which, in the final analysis, the plaintiff's case is based, or as summarized in the brief of counsel:

"This early conception of Frasch, as set forth in three of his patents long since expired, is relied upon by the defendant as its chief defense in this case; but those patents did not disclose any practical means of mining sulphur. *They stated a problem, and not a solution of it. They suggested a line along which to invent,* and, without further invention, their disclosures were useless."

We cannot agree with this contention, and in our judgment the facts do not warrant any such conclusion. We find no proof to warrant the conclusion now made, namely, that these expired patents of Frasch are based on the assumption that the sulphur deposit was free from water. Answering such contention, we may refer, amongst others, to these considerations: There is no such allegation or suggestion in the patents themselves; the bleed pipe $T$, shown in patent No. 461,430, for the reasons stated in discussing it at an earlier stage, is at variance with the contention now made; the 13 test wells, already drilled into the sulphur bed before Frasch began, told the character of that bed; the flow of sulphur water from these wells indicated sulphur contact; the Louisiana sulphur core, which Frasch said he had, of course, disclosed its own nature and formation, and there is no evidence that Frasch knew anything about the formation of Sicilian sulphur, and whether there was or was not water in the Sicilian mines; the testimony of Hoffman discloses no surprise at encountering water in the sulphur bed, and the account of Frasch makes no mention that the presence of water in the well he drilled (No. 14) caused him any surprise; on the contrary, the extract we have already quoted, and the sequence of events narrated by Frasch, tend to show that it was the water flow in the sulphur which led to the New York Company ceasing shafting operations, and that it was after that company ceased shafting that Frasch began drilling operations; when Frasch applied for the patents in suit, he made no contention or statement that he had discovered water in the sulphur deposit, and that its presence created difficulties which he had overcome by making further inventions.

We also think that a study of the application Frasch filed when he applied for patent No. 800,127, here in suit, clearly shows that his original process contemplated either a porous or nonporous sulphur rock, and that his alternative apparatus contemplated the use of one apparatus when the rock was porous and another when it was nonporous. Turning to the specification, we find Frasch thus describes the pioneer process and the apparatus for using it:

"Heretofore I have secured letters patent of the United States No. 461,429, dated October 20, 1891, for the recovery of sulphur by the process above indicated, and also letters patent No. 461,430 for apparatus for effecting such recovery. In said patents apparatus is described in which there are pipes by which hot water is circulated through the underground deposit, being introduced by one pipe and returned by another, and being always above the temperature at which sulphur melts. For raising the melted sulphur use is made in the patents of one of said pipes, or *else an additional pipe is provided for the purpose.* Either way the melted sulphur is forced up the proper pipe

by the pressure in the mine cavity or by the direct lift of a pump at the bottom of the sulphur pipe. For heating the water, fire-heated boilers are provided in said patents, through which the water to be heated is passed. With a sulphur deposit of such nature that the walls of the mine cavity are tight, and so able to allow the necessary pressure to be developed in the said cavity, the lifting of the melted sulphur by the hydraulic pressure can be effected; but in the case of a sulphur deposit in porous rock, which would not allow a sufficient pressure to exist therein, *it was heretofore necessary to resort to a lifting pump, whose action was not dependent upon the tightness of the walls of the mine cavity."*

His language and meaning are clear. The original process he was describing might be applied where the sulphur was tight, or as the specification says:

"With a sulphur deposit of such nature that the walls of the mine cavity are tight, and so able to allow the necessary pressure to be developed in the said cavity, the lifting of the melted sulphur by the hydraulic pressure."

On the other hand, if the hydraulic pressure could not be worked because the sulphur was porous, then another agency, to wit, a pump, was provided, or, as the specification says:

"But in this case of a sulphur deposit in porous rock, which would not allow a sufficient pressure to exist therein, it was therefore necessary to resort to a lifting pump, whose action was not dependent upon the tightness of the walls of the mine cavity."

In view of these statements of Frasch himself, made in 1897, when he was describing his original process, that the pump was for use in a porous formation, the contention now made, after his death, that his process was wholly for a tight deposit, does not carry conviction.

Laying aside such contention, and regarding the three patents in suit, in the light of a previous process which applied to both porous and nonporous sulphur, we address ourselves to the question whether they involve invention. Taking first the process patent, No. 799,642, which was applied for May 27, 1897, and granted September 19, 1905, whose claims 2, 3, 6, 12, 19, 21, and 22 are here in issue, we note that, of these claims, Nos. 3, 12, 21, and 22 alone were in the application as originally made, and none of them involve the element of porosity of structure, and that claims 2, 6, and 19, which do involve porosity, and the part of the specification, from line 30 on page 1 to line 9 on page 2, on which said claims are based, were only brought into the application in 1903. Turning to original claims 3, 21, and 22, we find they involve the use of air in raising the melted sulphur, and a top and bottom delivery of hot water to melt the sulphur. Both these agencies may be useful. They were, of course, novel in their application to sulphur mining in place, for sulphur mining was original with Frasch; but when Frasch had already disclosed the process of sulphur mining in place, and had actually melted and brought to the surface such sulphur by other means, we are of opinion it involved no invention to apply the hot water at two different levels, or after he had melted it to use air pressure as a means of bringing the liquefied sulphur to the surface. We therefore hold these claims as lacking invention, and therefore invalid. As to claims 2, 6, and 19, they involve porosity of the sulphur, and are based on the assumption that the process of this

patent disclosed, and the preceding patents of Frasch did not disclose, sulphur rock porosity. In view of what we have already said as to sulphur rock porosity being known to Frasch, and that his former patents were not restricted to tight and nonporous rock, it follows that these claims have no ground on which to rest, and they must also be held invalid.

And we may add that a study of the file wrapper of this patent confirms us in this view, for it discloses earmarks of a not infrequent effort, when the term of a primary patent is near expiration, to obtain an extension for another term of years, that has already been enjoyed. In this case Frasch's original patent expired in 1908. If the claims of the present patent, granted in 1908, were sustained, the plaintiff would have a monopoly of underground sulphur mining of 31 years. This would have been effected by the filing of his second series of patents in 1897, introducing therein claims based on porosity in 1903, and by a consistent series of delays in procedure, whereby the grant of such patents was delayed until 1905. While such course is legal, and involves nothing censurable, yet when the practical effect, if the patent it enforced, as now contended for, be, as we have said, to shut out the public from the field of underground sulphur liquefying for 31 years, it behooves a court, before following such a course, to take great care to avoid being led to a decision which, instead of fulfilling the constitutional purpose of promoting the progress of science and useful arts, in reality blocks the path of improvement.

Turning to the second patent, No. 800,127, for apparatus for mining sulphur, of which claims 2, 3, 7, 11, 21, and 24 are in issue, we are of opinion that claims 2 and 3 embody means necessarily incident to the use of the original, and which, in substantial equivalency, were used in the practice of Frasch's original patents as described in testimony heretofore quoted. As to the several combinations embodied in claims 7, 11, and 21, which embrace delivery of hot water at different levels, we are of opinion they do not involve patentability, and as to claim 24 we are also of opinion that it lacks inventive substance. This leaves for discussion claims 7, 26, and 28 of the third patent in suit, No. 1,008,319, applied for February 6, 1905, granted November 14, 1911, for mining sulphur. Referring to claims 7, 26, and 28, which are alone in issue, we find they include, in combination and in liquefaction mining, a perforated lining which distributes the outgoing hot water over a wider zone; and by its many and widely scattered holes prevents clogging, where the surrounding substances cave in as liquefaction proceeds. The use of a perforated pipe for such general purposes is too manifestly such a mere mechanical expedient that we cannot find any inventive act in using such a strainer in mining by liquefaction. We accordingly hold these claims void.

Arriving at the foregoing conclusions, it follows that, without alluding to the other and many interesting questions discussed in the briefs and at bar, the several claims of said patents must be decreed invalid, and the bill dismissed.